IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOSEPH DeSANTIAGO | ) | 4:06CV3088 |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| JON PUCKET, | ) | |
| | ) | |
| Defendant. | ) | |

At 10:38 p.m., on September 2, 2004, the defendant, Jon Pucket, an officer in the Seward Police Department, was dispatched to the lobby of the police station to speak with Donna Green and Krystal DeSantiago. Both women expressed concern about the well-being of the plaintiff, Joseph DeSantiago, and indicated that they believed him to be suicidal. Ms. Green said that they were at Mr. DeSantiago's residence a few minutes earlier, and that he had threatened to "wrap his car around a tree" after she broke up with him. Krystal DeSantiago, the plaintiff's daughter, told Officer Pucket that she believed her father had been drinking alcohol, and he had left in his car with a knife under the seat. Officer Pucket contacted dispatch requesting that a teletype be sent out to watch for Mr. DeSantiago, and was advised almost immediately that Mr. DeSantiago had been spotted at his residence. Officer Pucket then drove to that location and saw Mr. DeSantiago standing in his yard, about 15 feet away from a vehicle that was parked in the driveway.

According to Officer Pucket, Mr. DeSantiago ran toward the vehicle when he saw the patrol car park in front of the house; Officer Pucket activated the patrol car's overhead lights and yelled at Mr. DeSantiago that he wanted to talk to him; but Mr. DeSantiago entered his vehicle, backed it out of the driveway, narrowly missing the patrol car, and began driving down the street. Mr. DeSantiago admits that he walked to his car and drove away, but denies that he ran, that Officer Pucket said anything to him, or that he almost hit the patrol car while backing out of the driveway.

Officer Pucket states that he followed in his patrol car, with the lights still flashing, and observed Mr. DeSantiago's vehicle stall several times before finally coming to a stop near an intersection about a half block from Mr. DeSantiago's residence. This statement is verified by another officer who arrived on the scene after hearing on the police radio that Officer Pucket was attempting to make a stop, but Mr. DeSantiago says that he pulled over as soon as Officer Pucket activated his overhead lights.

A video camera in the patrol car was activated a few seconds before Mr. DeSantiago stopped his vehicle.[1] At the start of the video, the DeSantiago vehicle is on the left hand side of the street, angled toward the right, and close to the front end of Officer Pucket's patrol car; the patrol car does not appear to be moving. As the tape continues, the DeSantiago vehicle moves in front of the patrol car and then proceeds down the right hand side of the street for several yards before stopping in front of a stop sign at the intersection; Officer Pucket follows and parks behind the DeSantiago vehicle; a spotlight on the patrol car is then turned on.

The video next shows Officer Pucket walking up to the driver's side of the DeSantiago vehicle, where he shines a flashlight inside. About ten seconds later Officer Pucket turns on his shoulder microphone and can be heard directing Mr. DeSantiago to turn off the car's engine and to step outside. This directive is issued several more times over the next minute or so, with Mr. DeSantiago protesting that he had done nothing wrong, that he "did not break a fucking law," and Officer Pucket replying that he understood but that he needed to make sure that Mr. DeSantiago was alright because people were concerned with his safety. Mr. DeSantiago finally gets out of his vehicle, slams the door shut, utters an obscenity, and walks back toward the patrol car, where Officer Pucket and two other officers are standing. Mr. DeSantiago is a large man, about 6 feet 4 inches tall and weighing 300 pounds.

---

[1] The evidence does not show whether the camera is manually activated or whether it automatically turns on when the overhead lights are activated.

Some conversation ensues that is not audible on the tape, but Mr. DeSantiago then begins backing away from the officers. As Mr. DeSantiago nears his vehicle, Officer Pucket draws an X26 Taser and tells Mr. DeSantiago to put his hands behind his back. Mr. DeSantiago ignores the command, and, with his arms outstretched, continues backing up toward the intersection. An illuminated dot from the Taser's laser targeting device is visible on his chest. The officers triangulate around Mr. DeSantiago as Officer Pucket again tells him to put his hands behind his back, and then to get down on the ground. Mr. DeSantiago continues backing up until he is in front of his car and close to the intersecting street. During this encounter, traffic is moving through the intersection.

Twenty-three seconds after Officer Pucket unholstered the Taser, it is fired; Mr. DeSantiago immediately screams in pain and falls to the ground. The screaming lasts for less than 3 seconds. The officers converge on Mr. DeSantiago and continue to instruct him to put his hands behind his back; at one point Officer Pucket tells Mr. DeSantiago that he will "get it again" if he does not comply.

Mr. DeSantiago states that he "physically could not comply because of the paralyzing nature of the taser" and that Officer Pucket "ultimately released the trigger on the taser but it was more than just the initial jolt." (Filing 31-2, ¶¶ 14-15.) Officer Pucket states that he "did not apply any force from the Taser on Mr. DeSantiago other than the initial jolt that knocked Mr. DeSantiago to the ground." (Filing 23-2, ¶ 11.)

Although Mr. DeSantiago cannot be seen on the video while he is on the ground, it appears that he is handcuffed within 20 seconds after falling to the ground. He is then gotten to his feet and walked to the patrol car.

Officer Pucket states that he removed the Taser prongs from Mr. DeSantiago's body (one prong from his chest and the other prong from his abdomen) and placed him in the patrol car. Officer Pucket then advised Mr. DeSantiago that he was under arrest and proceeded to search his vehicle. A "Buck" knife with an 8-inch blade was

3

found under the passenger seat. Mr. DeSantiago was then transported to the Seward County Jail, where he was lodged.

Mr. DeSantiago alleges that Officer Pucket violated his rights under the Fourth and Fourteenth Amendments by arresting him and by using excessive force to effect the arrest. Officer Pucket claims qualified immunity.

Qualified immunity protects government officials from the costs of trial and the burdens of broad discovery unless their discretionary acts violated clearly established statutory or constitutional rights. Wilson v. Northcutt, 441 F.3d 586, 590 (8th Cir. 2006) (citing Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982)). A defendant's claim of qualified immunity is determined by an objective standard. Id.

> In ruling on a qualified immunity issue, courts must apply a two-part inquiry. First, a court must determine whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). If a "violation [can] be made out on a favorable view of the parties' submissions," the reviewing court must then ask whether "the right was clearly established . . . in light of the specific context of the case." Id. "For a right to be considered clearly established, the 'contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Lawyer v. City of Council Bluffs, 361 F.3d 1099, 1103 (8th Cir. 2004) (quoting Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

Plemmons v. Roberts, 439 F.3d 818, 822 (8th Cir. 2006).

Mr. DeSantiago argues, first of all, that Officer Pucket did not have probable cause to make an arrest. While the record does not disclose that Officer Pucket gave a reason when he made the arrest, his state of mind (except for the facts that he knew) is irrelevant to the existence of probable cause. See Devenpeck v. Alford, 543 U.S. 146, 153 (2004). That is to say, his subjective reason for making the arrest need not

4

be the criminal offense as to which the known facts provide probable cause. Id. On the record presented, it is clear to me that Officer Pucket could reasonably have believed—whether or not he actually did so—that Mr. DeSantiago's uncooperative behavior, starting with his attempt to flee in a car and ending with his walking away from the officers, was a violation of Neb. Rev. Stat. § 28-906(1) ("A person commits the offense of obstructing a peace officer, when, by using or threatening to use violence, force, physical interference, or obstacle, he or she intentionally obstructs, impairs, or hinders . . . the enforcement of the penal law or the preservation of the peace by a peace officer . . .."). See In re Interest of Richter, 415 N.W.2d 476, 477-78 (Neb. 1987) ("preservation of the peace," as used in § 28-906(1), means maintaining the tranquillity enjoyed by members of a community where good order reigns; even if the word "physical" modifies "obstacle," as well as "interference," the act of running away is a "physical" obstacle in the sense that it is an act which has material, substantive, and objective existence); United States v. Sledge, 460 F.3d 963, 967 (8th Cir. 2006) (mere act of running away from law enforcement officers constitutes physical interference or obstacle within the meaning of § 28-906(1)).

There is no question that it was appropriate for Officer Pucket to initiate the contact with Mr. DeSantiago outside of his house after it was reported that he was suicidal. "[P]olice officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions.'" Winters v. Adams, 254 F.3d 758, 763 (8th Cir.2001) (quoting United States v. King, 990 F.2d 1552, 1560 (10th Cir.1993)). See also Cady v. Dombrowski, 413 U.S. 433, 441 (1973) (observing that local police officers frequently "engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.").

While it is disputed whether Mr. DeSantiago ran or walked to his car after seeing Officer Pucket park in front of his house, or whether the officer said anything to him beforehand, the mere act of driving away physically interfered with or

5

obstructed Officer Pucket's investigation into the report that he had received from Mr. DeSantiago's daughter and girlfriend. Considering that Mr. DeSantiago had threatened to "wrap his car around a tree" and reportedly had been drinking, this investigation necessarily involved "preservation of the peace." Thus, there was probable cause to arrest Mr. DeSantiago as soon as he got into his car. In any event, Officer Pucket's community caretaker role did not end when Mr. DeSantiago drove off; to the contrary, it would have been a dereliction of Officer Pucket's duties had he not followed and stopped this potentially dangerous driver.

Community caretaker functions "include seizing a citizen 'in order to ensure the safety of the public and/or the individual, regardless of any suspected criminal activity.'" Samuelson v. City of New Ulm, 455 F.3d 871, 877 (8th Cir. 2006) (quoting Winters, 254 F.3d at 763). "Whether the seizure of a person by a police officer acting in his or her noninvestigatory capacity is reasonable depends on whether it is based on specific articulable facts and requires a reviewing court to balance the governmental interest in the police officer's exercise of his or her 'community caretaking function' and the individual's interest in being free from arbitrary government interference." Id. (quoting King, 990 F.2d at 1560).

Mr. DeSantiago was not seized until he had placed himself and the officers in danger by continuing to walk backwards toward the intersection. Even if there had not been probable cause to arrest him, there was reasonable cause to take him into protective custody at this point. Consequently, Officer Pucket is immune from suit on the plaintiff's "unlawful arrest" claim. As discussed below, Officer Pucket is also immune from suit on the plaintiff's further claim that excessive force was used to effect the seizure.

Excessive force claims occurring in the context of seizures are analyzed under the Fourth Amendment, using its reasonableness standard. Henderson v. Munn, 439 F.3d 497, 502 (8th Cir. 2006). "To establish a constitutional violation under the Fourth Amendment's right to be free from excessive force, 'the test is whether the

6

amount of force used was objectively reasonable under the particular circumstances.'" Littrell, 388 F.3d at 583 (quoting Greiner v. City of Champlin, 27 F.3d 1346, 1354 (8th Cir.1994)). The reasonableness of a particular use of force is analyzed "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. 386, 396 (1989). Thus, the analysis must allow "for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396-97.

Not every push or shove by an officer violates the Fourth Amendment. Andrews v. Fuoss, 417 F.3d 813, 818 (8th Cir. 2005). Factors to consider include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." McVay v. Sisters of Mercy Health System, 399 F.3d 904, 908 (8th Cir. 2005) (tackling intoxicated individual to prevent him from injuring himself was not unreasonable) (quoting Graham, 490 U.S. at 396). In addition to the circumstances surrounding the use of force, the result of the force may also be considered. See Littrell, 388 F.3d at 583.[2]

Officer Pucket judged his use of the Taser to be the safest course of action for all concerned, because attempting to wrestle Mr. DeSantiago to the ground or using batons to subdue him would likely have resulted in personal injuries and posed a greater risk because of the nearness of traffic on the street behind him. The other officers on the scene concur in this opinion. There is no evidence that the Taser caused any lasting injury. Although Mr. DeSantiago claims that he was subjected to

---

[2] In determining whether the amount of force used to effect an arrest was reasonably necessary, jurors in this circuit are instructed to "consider such factors as the need for the application of force, the relationship between the need and the amount of force that was used, the extent of the injury inflicted, and whether a reasonable officer on the scene, without the benefit of 20/20 hindsight, would have used such force under similar circumstances." 8th Cir. Civil Jury Instr. 4.10 (2005).

7

"more than just the initial jolt" of electricity from the Taser, it is evident from the videotape that he did not suffer prolonged agony. Even if a second jolt of electricity was applied after Mr. DeSantiago was on the ground and not obeying the officers' commands to put his hands behind his back, no reasonable jury would find that Officer Pucket acted improperly under the circumstances.

Accordingly,

IT IS ORDERED that:

1. Defendants' motion for summary judgment based on qualified immunity (filing 21) is granted;

2. Defendant's motion to withdraw his motion for leave to submit reply brief (filing 35) is granted.

3. Defendant's motion for leave to submit reply brief (filing 33) is withdrawn.

4. A final judgment shall be entered by separate document.

November 29, 2006.          BY THE COURT:

                            s/ *Richard G. Kopf*
                            United States District Judge